**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: N.A.G.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.G.D., FATHER | : | |
| | : | |
| | : | No. 1763 MDA 2024 |

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88877

| | | |
|---|---|---|
| IN RE: N.J.G.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.G.D., FATHER | : | |
| | : | |
| | : | No. 1764 MDA 2024 |

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88878

| | | |
|---|---|---|
| IN RE: N.J.G.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.G.D., FATHER | : | |
| | : | |
| | : | No. 1765 MDA 2024 |

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88879

| | | |
|---|---|---|
| IN RE: N.J.G.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

APPEAL OF: A.G.D., FATHER :
 :
 :
 :
 :
 :
 :
 :
 : No. 1766 MDA 2024

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88880

IN RE: N.J.G-P., A MINOR : IN THE SUPERIOR COURT OF
 : PENNSYLVANIA
 :
APPEAL OF: A.G.D., FATHER :
 :
 :
 :
 :
 :
 : No. 1767 MDA 2024

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88881

IN RE: N.J.G.-P., A MINOR : IN THE SUPERIOR COURT OF
 : PENNSYLVANIA
 :
APPEAL OF: A.G.D., FATHER :
 :
 :
 :
 :
 :
 : No. 1768 MDA 2024

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88882

IN RE: N.J.G.-P., A MINOR : IN THE SUPERIOR COURT OF
 : PENNSYLVANIA
 :
APPEAL OF: A.G.D., FATHER :
 :
 :
 :

|  | : |  |
|---|---|---|
|  | : |  |
|  | : |  |
|  | : | No. 1769 MDA 2024 |

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88883

| IN RE: N.J.G-P., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
|  | : | PENNSYLVANIA |
|  | : |  |
| APPEAL OF: A.G.D., FATHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 1770 MDA 2024 |

Appeal from the Decree Entered November 15, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88884

BEFORE:  MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: APRIL 28, 2025**

A.G.D. ("Father") appeals from the decrees entered in the Court of Common Pleas of Berks County Orphans' Court, which involuntarily terminated his parental rights to his eight minor Children pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1]  Father's appointed

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The eight Children at issue are: N.A.G.-P (born in March 2015) ("Child 1"), N.J.G.-P (born in November 2016) ("Child 2"), N.J.G.-P (born in October 2017) ("Child 3"), N.J.G.-P (born in November 2018) ("Child 4"), N.J.G.-P (born in November 2019) ("Child 5"), N.J.G.-P (born in March 2021) ("Child 6"), N.J.G.-P (born in December 2021) ("Child 7"), and N.J.G.-P (born in February
*(Footnote Continued Next Page)*

counsel, Jacob T. Thielen, Esquire, has filed an ***Anders***[2] brief, along with a petition seeking to withdraw from representing Father on appeal. After a careful review, we affirm the Orphans' Court's decrees and grant counsel's petition to withdraw.

The relevant facts and procedural history are as follows: Mother and Father are married, and they have eight minor Children. On March 1, 2023, Berks County Children & Youth Services ("BCCYS") received a report that Mother gave birth to Child 8, who is the youngest child. Child 8 was placed in the Neonatal Intensive Care Unit ("NICU") due to withdrawal symptoms. BCCYS discovered that many of the Children had medical issues for which neither Mother nor Father ensured they received proper treatment.

For example, Child 7 had bowel obstructions, needed surgery, and was not taken to necessary ophthalmologist appointments; Child 6 missed necessary appointments with a urologist; Child 5 had failure to thrive and low thyroid levels but was not taken for follow-up bloodwork; Child 3 had not seen

_____

2023) ("Child 8"). Father filed a separate appeal at each lower court docket number, and this Court *sua sponte* consolidated the appeals. During the termination proceedings, Mother voluntarily consented to the relinquishment of her parental rights as to the eight Children, and she is not a party to this appeal.

[2] ***See Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 602 Pa. 159, 978 A.2d 349 (2009). The ***Anders*** principles and process have been extended to appeals involving the termination of parental rights. ***See In re V.E.***, 611 A.2d 1267 (Pa.Super. 1992) (extending ***Anders*** briefing requirements to termination of parental rights appeals involving indigent parents represented by court-appointed counsel).

a doctor for three years and, despite being referred to Early Intervention, no appointments were scheduled for him; Child 2 was diagnosed with failure to thrive; and Child 1 was referred to a gastroenterologist, but no appointments were made for him. In general, the Children did not attend wellness visits with any regularity.

Father, who is a native of Guatemala and does not speak English,[3] claimed to be unaware of the Children's needs and medical appointments. BCCYS discovered there was rarely more than enough food in the home for one meal at a time. There were unsafe conditions in the home. The Children smelled of urine and were not bathed. Father and Mother were unable to handle the needs of their eight Children.

> On March 23, 2023, due to these concerns, an emergency order was signed by the [Orphans' Court] placing the Children in the custody of BCCYS. A Shelter Care hearing was held the next day. Both Father and Mother were present.

> On March 29, 2023, [the Orphans' Court] conducted an Adjudication hearing and ordered legal custody to be transferred to BCCYS for placement purposes. The parents were both present at that hearing. [Relevantly, the Orphans' Court] ordered Father to cooperate with, *inter alia*, Parenting Education and casework services, participate in and attend all evaluations and medical appointments scheduled for the Children; maintain stable and appropriate housing; and sign medical releases. [Father] was permitted supervised visitation.

> On May 3, 2023, [the Orphans' Court] conducted a Dispositional Hearing. Both parents were present. Father was ordered to cooperate with Parenting Education, including hands

---

[3] Father has an active case with U.S. Immigration and Customs Enforcement ("ICE").

on and curriculum-based education five days a week as well as what was ordered on March 29, 2023.

On July 14, 2023, a Status Review Hearing was held before [the Orphans' Court]. Both parents were present and ordered to participate in Domestic Violence counseling. Visits were ordered to be in the parents' home and fully supervised for three hours. Visitation was divided into two separate visits to allow the four oldest Children to participate in one visit and the four youngest Children to participate in another.

[The Orphans' Court] held a Permanency Review Hearing on September 8, 2023. Father was present. Father was found to have moderate compliance and moderate progress toward alleviating the circumstances that led to the original placement of the Children.

[The Orphans' Court] held another Permanency Review Hearing on February 14, 2024. Father had moderate compliance with the permanency plan but minimal progress toward alleviating the circumstances that led to the original placement of the Children. On this date, visits were suspended for Father and his five oldest Children; his visits with the three younger Children remained supervised.

On March 7, 2024, the Children's Guardian *ad litem* ("GAL") filed a motion to suspend Father's visits with the Children. That motion was continued to May 6, 2024, for [a] hearing.

On May 6, 2024, a Status Hearing was held in conjunction with the hearing on the GAL's motion. [The Orphans' Court] granted the motion, in part, and Father's supervised visits were to be individually with each of the three older Children, changed to by-weekly for one hour and not to include siblings. Father's visits with the son who had been hospitalized were suspended pending the Child's discharge. Father's visits with his oldest daughter, [Child 7], were changed to once a month, for one hour, fully supervised. His visits with the three youngest Children were changed to one hour, fully supervised.

Orphans' Court Opinion, filed 1/9/25, at 6-9 (footnote and citations to record omitted).

On April 4, 2024, BCCYS filed petitions to terminate Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Specifically, BCCYS pointed to Father's inability to meet the Children's basic needs, his medical neglect of the Children, his inability to provide suitable house, and his lack of parenting skills. Termination hearings were held on July 15, 2024, August 12, 2024, August 23, 2024, and November 4, 2024. Father and Mother, along with their respective court-appointed attorneys and interpreters, appeared at the termination hearings. Finding no conflict between the legal and best interest of Child 1, who is the eldest child, the Orphans' Court appointed Child 1's GAL, Mark Zimmer, Esquire, to represent the legal interests of Child 1. Further, finding no conflict between the legal and best interests of the remaining seven Children, the Orphans' Court appointed their GAL, Ashley Esposito, Esquire, to represent the seven younger Children's legal interests.[4]

During the termination hearing, Alison Hill, Ph.D, a licensed psychologist, testified as an expert in the field of trauma evaluations. N.T., 8/12/24-11/4/24, at 24. She indicated that she primarily evaluates children. *Id.* at 19. Dr. Hill indicated she provided trauma evaluations for Child 1, Child 2, and Child 3. She was providing her opinions with a reasonable degree of psychological certainty. *Id.* at 25, 42. She had in-person clinical interviews

---

[4] The Orphans' Court found the seven younger Children had no conflicting best or legal interests among themselves.

with the three eldest Children, as well as asked the foster parents to complete behavioral assessments. *Id.* at 26.

Regarding Child 1, who is the eldest Child, Dr. Hill found him to be restless, impulsive, and immature for his age. *Id.* Child 1 reported that, when he lived with Father, he was "yelled at and hit by both of his parents, mostly by Father." *Id.* at 27. He also told Dr. Hill that Father threatened Mother, and he threw dishes in the house. *Id.* Dr. Hill indicated Child 1 had difficulties in school, including threatening to kill someone, and he punched another child at camp. *Id.* Dr. Hill diagnosed Child 1 with post-traumatic stress disorder ("PTSD") and unspecified impulse control with conduct disorder. *Id.* at 29. Dr. Hill recommended that Child 1 continue with trauma therapy. *Id.* at 32.

Regarding Child 2, Dr. Hill testified she was very cooperative, friendly, and talkative. *Id.* Child 2 has been with her foster family since March 22, 2023, and she stated she did not want to return to live with her biological parents. *Id.* at 33. Dr. Hill noted Child 2 had some behavioral problems, including pulling down her pants and underwear during school. *Id.* at 34. Dr. Hill noted Child 2 has made progress while living with her foster parents. *Id.* at 35. However, she indicated she is "a very needy little girl," who was neglected by her biological parents when she was very young. *Id.* at 36. She indicated Child 2 informed her that, when she lived with Father, she often hid because Father would "hit her with a phone charger." *Id.* at 39. Child 2 also

told her there were mice and cockroaches in the home, Mother slept most of the time, and she was always hungry. *Id.* at 46. She saw Father "choke her mother." *Id.* Dr. Hill diagnosed Child 2 with PTSD and unspecified impulse control with conduct disorder. *Id.* at 36.

Regarding Child 3, Dr. Hill indicated he was having significant problems in school, as well as in his foster home. *Id.* at 38. Dr. Hill testified that, during her interview with Child 3, he told her that, when he lived with his biological parents, he saw them hit each other. *Id.* at 39. He told her that they both hit him and his siblings, as well. *Id.* He told her that he had the desire to set fires, and he was often angry because he saw Father hurt his siblings. *Id.* He played violently with toys. *Id.* Dr. Hill diagnosed Child 3 with PTSD, unspecified impulse control with conduct disorder, and attachment disorder. *Id.* at 40-41. She noted that, because he was neglected while living with his biological parents, Child 3 is unable to develop relationships.

Dr. Hill opined that Child 1, Child 2, and Child 3 had been through "very distressing, traumatizing events" when they lived with Father and Mother. *Id.* at 49. This, in turn, resulted in their emotional state, acting out, and PTSD while they lived in foster care. *Id.* Dr. Hill indicated Child 1, Child 2, and Child 3 have no attachment to Father. *Id.* at 54.

Brandon Ballentyne, a domestic violence evaluator, indicated he evaluated Father on August 2, 2023. *Id.* at 72. He opined Father is "a risk for recurring instances of domestic violence." *Id.* He noted his evaluation was

specifically focused on the risk of domestic violence between Mother and Father, and not violence towards the Children. *Id.* at 74.

Joel Cintron testified he is a caseworker at Child and Family First, and he provided services to Mother and Father from July 2023 to February 14, 2024. *Id.* at 81. He noted that casework services involve working with the parents toward reunification with their children and helping them meet their court-ordered goals. *Id.* He met with Mother and Father once a week, and he addressed issues with them, such as ensuring the Children received the proper medical care. *Id.* at 82.

Mr. Cintron indicated Father did not understand how domestic violence could significantly impact the Children. *Id.* at 84. He testified that, on February 13, 2024, he observed physical marks of abuse on Father, and Mother reported she inflicted the wounds because "Father tried to choke her." *Id.* at 85. Father took no accountability for the domestic abuse or the circumstances leading to the Children's removal from his home. *Id.* at 86.

Mr. Cintron testified that, given the history of domestic abuse between Mother and Father, he was concerned about their ability to parent the Children. *Id.* at 88. He noted that Father generally denied there were any problems between him and Mother; however, on February 13, 2024, he finally admitted their "relationship was not working." *Id.* at 93. Father alleged Mother took, as well as dealt, illegal drugs. *Id.* at 94.

Mr. Cintron indicated he observed Mother and Father with Child 1 and Child 8 during two visits. *Id.* at 98. He testified Mother left during one of his visits because she and Father had just had a domestic dispute. *Id.* Mr. Cintron testified he stopped providing services to Mother and Father because Father called him an hour after the February 13, 2024, visit, alleging Mr. Cintron and Mother were having an affair. *Id.* at 100. Mr. Cintron indicated he did not want to jeopardize his professional career because of false accusations, so he stopped providing services to them. *Id.* at 105.

Erica Albino, from Partners in Parenting, has provided supervised visits and casework sessions to Father for a year and a half. *Id.* at 107-09. She began services in March of 2023 after the Children were removed from Father's home. *Id.* Ms. Albino testified that, for purposes of visits, the Children were broken into two groups by age because Mother and Father could not manage all eight Children. *Id.* at 109. She indicated they "could not control all eight kids at one time." *Id.* at 110. She testified Father visited the four eldest Children and then the four youngest Children. *Id.*

Ms. Albino testified she witnessed an incident during a visit when Father complained about the amount of food Mother had cooked for the visit, and Mother then "really belittled [Father] in front of the kids." *Id.* at 111. Ms. Albino indicated Child 1 was present during this visit, and the fighting "triggered" his nervous twitches. *Id.*

After February 14, 2024, Ms. Albino began supervising solely Father, without Mother being present. *Id.* at 112. Specifically, she generally supervised Father's visits with Child 6, Child 7, and Child 8. *Id.* She noted Father usually brought appropriate food or snacks; however, she noticed a lack of discipline. *Id.* at 113. She testified she had concerns about safety during Father's visits with Child 6, Child 7, and Child 8. *Id.* at 114. Specifically, she observed that Father could not safely watch the three youngest Children, and during one visit, she saw Child 8 put inappropriate items in her mouth without Father trying to stop her. *Id.* She testified that she needed to intervene at least once or twice during every visit for safety reasons. *Id.*

Regarding the Children's medical and behavioral needs, Father told Ms. Albino that he believes it is "something that Children Services is now making up just to make mom and [him] look bad." *Id.* at 115. He told Ms. Albino that "Children's Services is just a scam, and [they] take people's kids for just the fun of it and for money." *Id.* at 123. Ms. Albino testified Father does not take the Children's medical and behavioral needs "seriously at all." *Id.* Father told Ms. Albino that, in his view, the Children are too young to be diagnosed with any medical or behavioral issues. *Id.* at 118. She noted that he does not independently keep track of the Children's appointments.

Ms. Albino testified Father reported that he and Mother have separated. *Id.* at 136. She indicated Father does not have transportation. *Id.* He insists

he has people who will help him if he is reunited with the Children; however, he has never provided any names or proof of people who would support him. *Id.*

Ms. Albino testified regarding a specific visit she supervised between Father and Child 4, who was in the mental ward unit at the hospital. *Id.* at 123. She noted Father was heartbroken about the situation; however, he did not have a full understanding of why Child 4 was in the hospital. *Id.* at 124. Ms. Albino indicated Father believed Child 4 was in the mental ward simply because he misbehaved and had "temper tantrums." *Id.* Ms. Albino indicated that she also supervised a visit between Father and Child 1, who seemed to enjoy the visit. *Id.* at 125.

Ms. Albino testified she has supervised Father's visits with the four eldest Children. *Id.* at 126. She observed that, during the visits, Father seems to enjoy spending time with the eldest Children; however, he does not "really interact with them." *Id.*

Alyssa Roberts, who is an outpatient therapist, testified she was the individual therapist for Child 3 from July 2023 to June 2024, when Child 3 was transitioned to inpatient services. *Id.* at 138. She testified she recommended inpatient treatment for Child 3 on June 18, 2024, when he began talking about the desire to "cut off his toes," pushed his resource mother down the stairs, and displayed other "ramped up safety concerns." *Id.* at 144.

Ms. Roberts testified that, when she treated Child 3 in an outpatient setting, her goal was to help him cope with his past traumatic experiences. *Id.* at 141. She noted that, when Child 3 talked about past abuse at the hands of Father, his behaviors would become more problematic. *Id.* at 142. Child 3 told her he had been hit with a belt on numerous occasions, he was locked in the basement for long periods of time, and he was hungry when he lived with Father. *Id.* When he asked for food, he would be punished. *Id.*

Ms. Roberts testified Child 3 told her that he remembers seeing Mother "being hurt by dad and seeing a lot of blood." *Id.* at 147. Child 3 told Ms. Roberts that he believed he was in danger and would die, and Ms. Roberts testified this made him hyper-vigilant about protecting himself. *Id.* at 149. She opined Child 3 has severe symptoms of PTSD. *Id.* at 153.

Yanishka Velazquez, a caseworker for Signature Family Services, testified that, since March of 2024, she has provided services to Father, including domestic violence and nurturing parent services. *Id.* at 163. She explained she has directed him to resources in the community, assisted him in understanding the services, and helped him find other opportunities. *Id.* at 165. She explained the parenting program seeks to teach parents proper parenting skills, such as empathy, discipline, family roles, and appropriate expectations. *Id.* at 166.

Ms. Valazquez testified that Father describes his own parenting skills as "positive." *Id.* He reports being an "intensive Father." *Id.* She notes that

Father has taken no responsibility for the reasons the Children were removed from his care. *Id.* at 168. Father informed Ms. Valazquez that he has two people in the community willing to assist him with transporting the Children to medical appointments if they are returned to his care. *Id.* Ms. Valazquez testified that, because of his immigration status, Father does not qualify for public assistance. *Id.* at 172.

Ms. Valazquez opined that "it is not safe or appropriate for the Children to return to the care of Father." *Id.* at 169. She indicated her opinion is based on Father's lack of understanding regarding the Children's medical needs. *Id.* When she discusses the Children's medical needs, he becomes defensive and believes it is "an accusation towards him." *Id.* Father expresses his belief that the Children's medical and behavioral issues stem from being removed from his care as opposed to occurring because of what may have happened while they lived with him. *Id.* He informed Ms. Valazquez that he took care of providing for the family, and it was Mother's job to make sure the Children had proper medical care. *Id.* at 174.

Regarding Father's progress since he has been receiving services, Ms. Valazquez rated Father's progress with domestic issues as "moderate," and his progress with becoming a nurturing parent as "moderate." *Id.* at 179. She rated his progress with employment and housing as "significant." *Id.* at 180.

Courtney Brensinger testified she is a specialized outpatient therapist, and she treated Mother. She indicated that Mother reported domestic violence

between her and Father. *Id.* at 188. One on occasion, Mother came to a session with a gash on her forehead with dried blood on it, and she reported a domestic violence incident. *Id.*

Lynette Nisley, an outpatient therapist with COBYS Family Services, began treating Child 4 on February 22, 2024. She has weekly sessions with him. *Id.* at 217. Ms. Nisley testified Child 4 is "a really sweet little boy, but he has pretty extensive emotional and behavioral needs." *Id.* She indicated he is highly reactive because of multiple trauma triggers, and he "tends to be a fighter." *Id.* She indicated Child 4 can become very aggressive, and it is trauma related. *Id.* Child 4's behaviors include "hitting, kicking, biting, pushing, throwing things, scratching himself, trying to throw himself down the stairs, trying to get out of the car, putting a chokehold on other classmates in his preschool, [and] trying to stab another classmate with a fork." *Id.* at 218.

Ms. Nisley noted that, during play, he hits stuffed animals, and he calls them ugly and stupid. *Id.* It is her clinical assessment that he is acting out in his play what he has heard and seen while living with his biological parents. *Id.* One time, he "was beating the one male doll…and he said, 'Daddy is mean.'" *Id.* at 219. Child 4 talked about being locked in the basement when he was "bad" and being told he would stay in the basement forever. *Id.* She noted that he became agitated during sessions, stabbed the dolls, and used a bristle block to stab the rectum of an anatomically correct doll. *Id.* at 220.

Ms. Nisley testified Child 4's foster mother is trained in trust-based relational interventions, and Child 4 will need "years" of intensive treatment. *Id.* at 221. She noted the foster mother is working towards making Child 4 feel "safe," so that he will be less aggressive. *Id.* at 226. Ms. Nisley noted that any full-time caretaker for Child 4 would need to have "a strong understanding of the needs of a child with trauma and being able to provide that feeling of safety." *Id.* at 228. She noted the caretaker must be emotionally stable and keenly aware of Child 4's needs. *Id.* at 229. She testified that Child 4 was in the psychiatric unit of Reading Hospital from April 23, 2024, to April 27, 2024, due to unsafe behavior, and he was placed at Southwood Psychiatric Hospital from April 27, 2024, to May 11, 2024. *Id.* at 243. Child 4 has not seen Mother or Father since May 6, 2024. *Id.* She indicated that contact with his siblings would be beneficial. *Id.*

Martha Aravalo, a caseworker for BCCYS, was assigned to the instant family on March 22, 2023, and she visited the biological parents' house that same day. *Id.* at 245. Child 1 and Child 2 were at school, so Ms. Aravalo found Father at home with six of the eight Children. *Id.* at 247. Ms. Avaralo discovered little food in the house and only three bedrooms. *Id.* at 257. The Children were sleeping among clutter, including on the beds and in the cribs. *Id.* Child 7, who was two years old, was asleep in a crib with a bead in her mouth. *Id.* There was no formula for the youngest child, Child 8, who was an infant. *Id.* at 248. Ms. Aravalo testified the Children were removed from

- 17 -

Father's care due to a lack of supervision and food, as well as concern about the Children's medical needs not being met. *Id.* at 249.

Ms. Aravalo testified that BCCYS worked with Mother and Father to reunite them with the Children. *Id.* On April 20, 2023, they had a family group decision-making meeting where Father and Mother were supposed to provide names and information for people available to assist and support them in raising the Children. *Id.* Father provided no information. *Id.* at 251.

Dr. Donna-Mae Fierras, a licensed psychologist, testified she conducted a bonding assessment of four of the Children relative to Father. *Id.* at 260. She testified that Child 4 minimally initiated contact with Father and was subdued in his play. *Id.* at 270. Dr. Fierras recommended that Child 4 and Father continue to receive support through BCCYS. *Id.* at 272.

She testified Child 5 suffers from PTSD. *Id.* at 275. She indicated that, during Child 5's first encounter with Father after being removed from his care, she was "incredibly distressed…crying, kicking." *Id.* Dr. Fierras discontinued the bonding assessment between Child 5 and Father until the next day. During the second-day assessment, Father was able to "assist with regulation." *Id.* at 277. She opined that, for Child 5 to be returned to Father's care, it would require Father to follow a consistent, structured schedule and not perceive Child 5 as being an inconvenience. *Id.* at 278.

She testified Child 6 showed signs of suffering from trauma. *Id.* at 279. She testified Child 6 showed a primary avoidance/dismissive attitude toward

Father with a lack of separation anxiety. *Id.* at 280. She noted Child 6 did not reciprocate any affection given to him by Father, and he seemed "indifferent." *Id.* at 281.

She testified Child 7 has underdeveloped speech and communication skills for her age. *Id.* at 282. She noted Child 7 does not have a secure attachment to Father. *Id.* at 283.

Dr. Fierras testified that, while attachment begins at birth, "attachment is really developed based on the caregiver consistently meeting [the child's] basic needs," so the child learns his or her needs will be met in a healthy way. *Id.* at 286. She noted the four Children she evaluated came into foster care with attachment disorders, and she noted this likely stemmed from the domestic violence to which they were exposed. *Id.* at 287.

Tonia Hoover, a parent trainer with Partners in Parenting, testified she began working with the family on March 9, 2023, before the Children were removed from Father's care. *Id.* at 316. She indicated she assisted with scheduling medical appointments for the Children and providing supplies for the Children. *Id.* She noted there were safety concerns about the house, and very hot food was being served to the Children. *Id.* at 333. The house was infested with cockroaches. *Id.*

After the Children were removed from the home, Ms. Hoover supervised visitation with all eight of the Children present with Mother and Father. *Id.* at 318. However, the visits were hectic, and the three youngest Children were

left in either a carrier or highchairs for lengthy periods. *Id.* Also, the older Children became aggressive towards each other, including throwing toys and hitting, which made it unsafe for all the Children. *Id.* at 320. During these visits, Mother and Father argued over whose responsibility it was to take care of the Children. *Id.* Ms. Hoover testified the Children responded poorly to their parents' arguing, including exhibiting nervous twitches, crying, throwing toys, and fighting with each other. *Id.* at 338.

After a few months, supervised visitation was broken into two groups with the four younger Children visiting with the biological parents and then the four eldest Children each visiting separately with the biological parents. *Id.* at 321. Ms. Hoover testified it was necessary to have separate groups for visitation purposes because it was clear that neither Mother nor Father could care for eight Children at one time, and it was unsafe for the Children when all eight were together. *Id.* at 322.

Ms. Hoover testified about incidents where, during visitations, the younger Children were permitted to eat Playdough, and food was left out with the Children being expected to eat it even after cockroaches had crawled through it. She noted Mother and Father did not co-parent; but rather, they argued, and she saw evidence of domestic abuse. *Id.* at 326. Specifically, after a visit, Ms. Hoover took Mother to the hospital because Father had "busted her head open." *Id.* Mother told Ms. Hoover that she had been pregnant ten times, and eight of the pregnancies were nonconsensual. *Id.*

Ms. Hoover noted that, at some point, Father and Mother started to visit the Children independently of each other. *Id.* at 330. It became clear to Ms. Hoover that Father did not know the Children's birthdays, and he was not always sure the name(s) of the Children he was visiting. *Id.* at 331.

Gabriela Colon, a caseworker for BCCYS, testified she was assigned to the instant case on April 12, 2023, which was soon after the Children were removed from Mother's and Father's care. *Id.* at 369. She noted that Father was given the goal of receiving domestic violence and mental health counseling; however, he has not completed the goal. *Id.* at 373. She indicated that, throughout this case, it has been difficult to connect with Father because his phone has been "on and off." *Id.* at 374. She noted that Father would not provide consent for various medical issues, including surgery for one of the Children's undescended testicles, so BCCYS had to secure court orders. *Id.* Father also refused to acknowledge that the Children needed psychological treatment. *Id.* at 375. Father told Ms. Colon that, if he gets the Children back, he is taking them to Guatemala, and if he does not get them back, he is going to move away from the area. *Id.* at 381.

Ms. Colon explained that, since the Children have been in placement, the foster parents have created a network so they can visit each other. *Id.* at 393. She noted two sets of foster parents speak Spanish, and six of the Children are currently placed with adoptive resources. *Id.* at 394. The Children look to their foster parents to meet their needs, and the foster

parents meet their needs. *Id.* Ms. Colon testified that, in her opinion, it would be detrimental for the Children to be returned to Father's care.

Ms. Colon testified Child 1 is at Hoffman Homes, but he is receptive to being placed with a foster family. *Id.* at 407. Child 2 is very bonded with her foster family and has expressed that she feels safe in her placement. *Id.* at 410. Child 3 has significant mental issues, and after being placed with his school therapist, he was moved to KidsPeace. *Id.* Child 3 was dysregulated after visits with Father and unable to calm himself. *Id.* at 412. There is a child specific recruitment in place to try to match him with a family. *Id.* Father refuses to acknowledge Child 3's psychological or medical problems. *Id.*

Child 4 has significant mental issues but is loving towards his foster mother. *Id.* at 416. Child 5 is bonded with her foster parents. *Id.* at 417-18. Child 6 and Child 7 were placed in the same foster home, and they are bonded with their foster parents. *Id.* at 420. Child 8, who was an infant when she was placed with her foster family, is bonded with her foster family. *Id.*at 421. She has met all milestones. *Id.* In conclusion, Ms. Colon testified it is in the best interests of the Children that Father's parental rights be terminated. *Id.*

Leopoldo Sanchez testified he knows Father from work, and he is a good employee. *Id.* at 428. He admitted that he had never been in Father's home, and he has never seen Father with the Children. *Id.* at 429. Justinelly Venderhorst testified she knows Father from church, and she has never seen him act violently. *Id.* at 433.

Father testified he no longer lives with Mother. He loves the Children, and he has a team of people who are "behind him." *Id.* at 437. He testified that he plans to send the Children to daycare at the church or school if they are old enough. *Id.* at 438. He testified he enjoys cooking for the Children, and he will keep the house clean. *Id.* at 440. He noted his support team will help him take the Children to doctors' appointments. *Id.*

He denied ever abusing Mother, and as it relates to the Children, he insisted he tried to "protect their souls" by avoiding arguments. *Id.* at 441. He denied hitting the Children with a belt or spanking them. *Id.* at 443. He indicated he disciplines them by talking to them. *Id.* He testified he will be a better parent now that Mother is not living with him, and he will ensure the Children's medical needs are met. *Id.* at 444-54. He testified he would continue the Children's therapy, as well. *Id.* at 459.

At the conclusion of the hearing, by decrees entered on November 15, 2024, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father filed timely counseled notices of appeal, as well as contemporaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' Court filed a responsive opinion. Thereafter, on February 11, 2025, Father's counsel, Attorney Thielen, filed a petition to withdraw his representation, as well as an *Anders* brief.

On appeal, counsel sets forth in the **Anders** brief the issue of whether the Orphans' Court erred in terminating Father's parental rights since BCCYS did not establish by clear and convincing evidence the grounds for termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as failed to demonstrate termination would be in the Children's best interest under Subsection 2511(b).

Our standard of review is well-settled:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the [Orphans' Court's] factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the [Orphans' Court's] order only if we conclude that the [Orphans' Court] abused its discretion, made an error of law, or lacked competent evidence to support its findings. The [Orphans' Court's] decision is entitled to the same deference as a jury verdict.

**In re L.M.**, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Further, we have stated:

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result. We are bound by the findings of the [Orphans' Court] which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The [Orphans' Court] is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the [Orphans' Court's] inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the [Orphans' Court's] sustainable findings.

**In re M.G.**, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

Before we begin our substantive analysis, we must address the petition to withdraw as counsel, which was filed by Father's counsel, Attorney Thielen. When counsel files an **Anders** brief, this Court may not review the merits without first addressing counsel's request to withdraw. **Commonwealth v. Washington**, 63 A.3d 797, 800 (Pa.Super. 2013). We review Attorney Thielen's **Anders** brief for compliance with the requirements set forth by our Supreme Court in **Santiago**, **supra**.

> Counsel must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, **supra**, 978 A.2d at 361.

Additionally, pursuant to **Commonwealth v. Millisock**, 873 A.2d 748 (Pa.Super. 2005), and its progeny, "[c]ounsel also must provide a copy of the **Anders** brief to his client." **Commonwealth v. Orellana**, 86 A.3d 877, 880 (Pa.Super. 2014). Counsel must attach to the brief a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the **Anders** brief." **Id.** (internal quotation marks and citation omitted). "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct

- 25 -

its own review of the [Orphans' Court's] proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa.Super. 2007) (*en banc*) (quotation omitted).

Here, Attorney Thielen filed a petition to withdraw, and, therein, he confirmed he sent Father a letter informing him of his right to obtain new counsel, or to proceed *pro se*, and explained that Father may raise any additional arguments with this Court. A copy of this letter is attached to the petition to withdraw.[5] *See* Petition to Withdraw, filed 2/11/25.

In his *Anders* brief, Attorney Thielen sets forth the relevant history of the case, as well as his reasons for concluding that Father's appeal is wholly frivolous. Attorney Thielen indicates in his petition that a copy of this brief was forwarded to Father. *See* Petition to Withdraw, filed 2/11/25. Accordingly, we conclude that Attorney Thielen has complied with the technical requirements of *Anders*, *Santiago*, and *Millisock*. We, therefore, proceed with our independent review of the record and the issues presented on Father's behalf.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The Orphans' Court must initially determine whether the conduct of the parent warrants

---

[5] We note Father did not file a brief with privately retained counsel or *pro se*.

termination under Subsection 2511(a). Only if the court determines that the petitioner established grounds for termination under Subsection 2511(a) does it then engage in assessing the petition under Subsection 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Subsections 2511(a) and (b) by clear and convincing evidence. *Id.*

Instantly, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with the Orphans' Court's findings under any one enumerated Subsection of 2511(a), as well as 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In this case, we review the decrees pursuant to Subsections 2511(a)(8) and (b), which provide as follows.[6]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions

---

[6] Based on this disposition, we need not consider Father's issues with respect to Subsections 2511(a)(1), (2), and (5). *See In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*).

which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

Pursuant to Subsection 2511(a)(8), the petitioner must prove (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.  This Court has explained:

Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children.  **In re M.A.B.**, 166 A.3d 434, 446 (Pa.Super. 2017).  "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing."  **In re I.J.**, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition."  23 Pa.C.S.A. § 2511(b).

Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for

the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of [his] children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time…in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re M.E.*, 283 A.3d 820, 832 (Pa.Super. 2022) (citation omitted).

Subsection 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b). Our Supreme Court, in *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993), first recognized that the "emotional needs and welfare" analysis under Subsection 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the Court later articulated that the effect on the child of severing a bond with a parent requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, ___ Pa. ___, 296 A.3d 1085 (2023).

In concluding BCCYS proved the grounds for termination, by clear and convincing evidence, under Subsections 2511(a)(8) and (b), the Orphans' Court relevantly indicated the following:

> The testimony at trial showed that Father was a perpetrator of domestic violence, which he still denies. Father refuses to recognize the medical issues [the Children have] due to [the Children's] exposure to violence and neglect. Father doesn't have a driver's license to take [the Children] to [their] medical appointments. Father claims to have support to help him, but none were presented in the nineteen months this case has been ongoing. Father used inappropriate physical discipline, but he denied the allegations and claimed the Children were lying. Two cases for child abuse are being investigated. There are safety concerns and [a] roach infestation at Father's house. The conditions which led to placement have not been remedied and Father has not progressed. He is incapable of meeting [the Children's] needs, which are significant.

Orphans' Court Decrees, filed 11/15/25.

Additionally, the Orphans' Court relevantly indicated the following:

> [Child 1] has been at Hoffman Homes since June 12, 2024, where he is receiving weekly clinical meetings with his counselor, as well as group sessions, where he discloses different topics. [Child 1] has a caseworker through child specified recruitment to match him with different families; he works with the caseworker regularly and is receptive to this service.…[Child 1's] legal counsel informed the [Orphans' Court] that [Child 1] would hug his parents when he saw them and that he wants to go home.
>
> [The Orphans' Court] found that it is not in [Child 1's] best interest to return to Father. The attachment he has to Father is neither necessary nor beneficial for his long-term stability and security. It is in his best interest to find permanency, as [Mother consented to the termination of her parental rights], and there is no way to know if Father will even be available for him in the future. [Child 1] has significant needs that will not be addressed by Father, who continues to deny everything and blame everyone else. Further, more exposure to Father's violent behavior certainly will not be beneficial to [Child 1's] emotional well-being.

At the time of her placement, [Child 2] was two years behind medically, and she had a history of failure to thrive. She is currently receiving trauma therapy through COBYS Family Therapy. She has been placed with an adoptive resource. The case passed to adoption last April. She is bonded to her foster mom and looks to her for all of her needs. [Child 2] is attached to her. She is able to speak about any fears she has, what she experienced in the family home, and things she had experienced. She reported that Father used a belt to discipline her, and she would hide from him. She is in therapeutic services at COBYS. She likes it in [her foster] home and feels safe there. The severing of her attachment to Father will have no detrimental effect on her; it is neither necessary nor beneficial. Father is a violent man and dishonest. Having [Child 2] lose her foster mother, whom she trusts, would be detrimental to her overall well-being.

[Child 3], who was also diagnosed with, *inter alia*, PTSD,…never received recommended Early Intervention because it was never followed up on [by Mother and Father]. His last two placements in foster care were disrupted because of his aggressive behaviors. He became extremely dysregulated after visits with his [biological] parents. He was placed at KidsPeace on June 26, 2024….He receives weekly clinical meetings and group counseling sessions. Efforts are made to try to match him with a family, and he has a caseworker and child specific recruitment in place. Weekly referrals are being sent to different families. [Child 3] has an attachment to Father. However, his developmental trauma has had detrimental impacts on his reactivity, socio-emotional, and self-regulatory abilities. He has limited conflict resolution skills and hostile social engagement with others. Severing this attachment is necessary in order to get the care he needs for his overall well-being. Father will not even recognize [he has] medical issues. His relationship with Father is not beneficial to him in any way.

[Child 4] has a lot of triggers, some still unidentified, and [he] is constantly in and out of crisis. He had, *inter alia*, an adjustment disorder with mixed disturbance of emotions and conduct. When he first came into care, he had a wellness visit; he had not been seen by a doctor for two years. He had failed visions screens, so he has seen a specialist and prescribed glasses [since being removed from Father's care]. He's had a difficult time in placement because of his constant "fight or flight" mode, so he has been very aggressive toward some foster parents, school staff, peers, and anyone else around him….Child 4 has been

hospitalized. His GAL saw [Child 4] with his current foster mother; he is very loving to her and likes to be close to her. He sits on her lap, hugs her; he's very comfortable with her. She's been able to meet all his needs at this time. Severing the attachment that he has with Father is clearly necessary for his health and well-being. He needs the medical care he has been receiving, and he most likely would not receive [such medical care] if he were to be in Father's care. There is no benefit to maintaining a relationship with Father; quite the contrary, it would be detrimental to his overall well-being if his close relationship with his foster mother is severed.

[Child 5] was also diagnosed with PTSD and failure to thrive. When she first came into care, she was a year and a half behind in medical care. She is behind two years in bone growth. She is receiving IBHS Services at her placement agency for behavioral needs and communication difficulties. She has a bond with her foster parents and is now a completely different girl. She is talking, laughing, and running around the foster home. She looks to her foster parents to meet her needs, and they are capable of doing so, now and in the future. The bonding assessment reflected a disorganized attachment between [Child 5] and Father; the history of developmental trauma may be a factor contributing to [Child 5's] attachment style. Severing the bond to Father is necessary to her emotional and developmental well-being. It is in no way beneficial for her. She has the opportunity for stability and permanency with her foster parents, a situation she could never have with Father.

[Child 6] had missed urologist appointments, and he had an undescended testicle, which had not been addressed. It was thought he was autistic because he was nonverbal, and he had not reached the milestones that children his age typically meet. It was later determined that his lack of communication was due to neglect. He is currently making leaps and bounds in his foster home, where he was placed with [Child 7]. Since being in the current foster home, he has completely changed. He calls his foster parents mommy and daddy. He talks, laughs, runs, and giggles. The GAL assures the [Orphans'] Court that these foster parents will be able to meet any behavioral, emotional, or developmental needs that should arise in the future. The bonding assessment for [Child 6] showed clinical concerns of an insecure attachment style with Father. He has an avoidant/dismissive attachment style due to his physical and emotional needs not being met. The attachment to Father is neither necessary nor

beneficial for [Child 6]. All of his needs are being met by his foster family who offer him permanency.

[Child 7] was diagnosed with other specified trauma and stressor-related disorder and unspecified communication disorder. She had a history of missed NICU appointments, which were brought up to date once she came into the care of [BCCYS]. She was screened for her vision because she had not been seen by an ophthalmologist. She received what she needed to clear her vision. She is getting speech therapy. [Child 7] was placed in foster care with [Child 6]. Like him, she is now a completely different child. She calls her foster parents mommy and daddy. She talks, laughs, runs, and giggles. The GAL assures the [Orphans'] Court that the foster parents will be able to meet any behavioral, emotional or developmental needs of [Child 7] should they arise in the future. [Child 7's] attachment style with Father is primarily anxious/ambivalent due to her perceptions that he was unreliable and inconsistent as her caretaker. Her bond with Father is neither necessary nor beneficial to her emotional or developmental well-being and will cause her no harm if it is severed. In fact, her stability and security rests with her foster parents, who are meeting all of her needs.

[Child 8], the youngest child, had withdrawal symptoms when she was placed; she tested positive for opiates. She also had stomach issues that have been remedied. BCCYS placed her in foster care where she is doing great. She is meeting developmental milestones, and she is bonded to her foster family. She goes to her foster mother for everything. Her GAL has no concern that this foster family will not be able to meet any emotional, developmental or educational needs of [Child 8] now or in the future.

What is particularly important for the Children is that the foster parents of the younger ones are coordinated among themselves to create a network where they can rely on each other, rally together, and make sure the Children have contact with their siblings. They are a "rock star" team who give the Children the best hope of a bright future.

Orphans' Court Opinion, filed 1/9/25, at 23-28 (citations to record omitted).

We find no abuse of discretion. *In re L.M.*, *supra* (setting forth our standard of review). With respect to the first prong of Subsection 2511(a)(8),

the record demonstrates the Children have been removed from parental care for twelve months or more. Specifically, the Children were removed from Father's care on March 23, 2023, and they have not returned to his care thereafter.

With respect to the second prong of Subsection 2511(a)(8), we agree with the Orphans' Court that BCCYS met its burden of proving the conditions which led to the removal or placement of the Children continue to exist. **See In re T.S.M.**, **supra** (setting forth the burden of proof in termination cases). Specifically, the Children were removed from Father's care due to neglect, including lack of necessary medical treatment, insufficient food, and uncleanliness. Additionally, ongoing domestic violence traumatized the Children. There is ample evidence demonstrating Father is unable to provide a healthy and safe environment for the Children or even provide for the Children's basic needs. Thus, BCCYS met the second prong of Subsection 2511(a)(8).

With respect to the third prong of Subsection 2511(a)(8), we agree with the Orphans' Court that BCCYS proved termination of Father's parental rights will best serve the needs and welfare of the Children, many of whom have special developmental needs. **See In re T.S.M.**, **supra** (setting forth the burden of proof). As indicated *supra*, the Orphans' Court considered the needs of the Children, concluded their needs have been better met since being removed from Father's care, and found any evidence of a bond between the

Children and Father was detrimental to the Children. The Orphans' Court determined that the Children's need for permanency is paramount in this case. We discern no abuse of discretion. *In re L.M.*, *supra*.

Having determined the Orphans' Court properly found BCCYS met its burden under Subsection 2511(a)(8), we next examine whether termination is in the best interests of the Children under Subsection 2511(b).  *See In re C.L.G.*, 956 A.2d at 1009 (holding that, after we resolve the analysis of the "needs and welfare of the child" under Subsection 2511(a)(8), we must then address the "needs and welfare of the child" under Subsection 2511(b)). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Subsection 2511(b) analysis." *In the Interest of K.T.*, *supra*, 296 A.3d at 1109.  It is within the province of the Orphans' Court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Id.*  We will not disturb such an assessment if the Orphans' Court's factual findings are supported by the record.  *See id.*

Here, as indicated *supra*, the Orphans' Court concluded that any bond between Father and the Children is neither necessary nor beneficial to their emotional or developmental well-being and will cause no harm if it is severed. The Orphans' Court found that the Children need permanency and stability, which Father is unable to provide. Accordingly, in considering the totality of the circumstances, we discern no abuse of discretion by the Orphans' Court in terminating Father's parental rights under Subsection 2511(b).

While Father indicated he would like a "second chance" to parent the Children without Mother's alleged interference, we note "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa.Super. 2008). Father's stated desire to parent the Children does not require that the Children be put in harm's way or indefinitely postpone adoption. *In re Z.P.*, 994 A.2d 1108 (Pa.Super. 2010). *See In Interest of Lilley*, 719 A.2d 327 (Pa.Super. 1998) (holding a parent's basic constitutional right to custody and rearing of his or her children is converted, upon parent's failure to fulfill parental duties, to the children's right to have proper parenting and fulfillment of their potential in a permanent, healthy, safe environment).

Finally, our review of the record does not reveal any non-frivolous issues overlooked by Attorney Thielen. After our independent review, we conclude that the evidence presented supports the Orphans' Court's decrees involuntarily terminating Father's parental rights pursuant to Subsections 2511(a)(8) and (b). *See In re Z.P.*, *supra* (absent abuse of discretion, error of law, or insufficient evidentiary support for the lower court's decision, decree in termination of parental rights proceeding must stand). Thus, we affirm the Orphans' Court's decrees and grant Attorney Thielen's petition to withdraw his representation.

Decrees affirmed.  Petition to withdraw granted.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>4/28/2025</u>